# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **APRIL HANSON,** <br><br> Plaintiff, <br><br> vs. <br><br> **CORSEARCH, INC., a global company with U.S. Headquarters in New York,** <br><br> Defendant. | **COMPLAINT** <br> **(JURY DEMANDED)** <br><br><br> Civil Case No: 1:25 CV 8518 |

Plaintiff April Hanson ("Ms. Hanson"), by and through her attorneys, hereby complains against Defendants Corsearch, Inc. ("Corsearch" or "Defendant"), as follows:

## NATURE OF THE CLAIMS

1. This suit is brought by a former employee of the Defendant under Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq*. ("Title VII") and the Idaho Human Rights Act, Idaho Code section 67-5901, *et seq*. ("IHRA"). Plaintiff alleges that she was sexually assaulted by an alter-ego of the Defendant and that Defendant created, maintained, condoned and otherwise failed to correct a gender-based hostile work environment.

2. Plaintiff seeks all available equitable relief, damages, attorney fees, costs, and interest.

## PARTIES

3. Plaintiff, April Hanson, is an adult individual, competent to bring this action, a citizen of the State of Idaho, and a resident of Ada County, Boise, Idaho. She was an employee of Corsearch at all times relevant herein.

4. Defendant, Corsearch, Inc. ("Corsearch"), is a private global company with U.S. headquarters in New York City, New York.

5. Defendant Corsearch is an employer within the meaning of the Idaho Human Rights Act, Idaho Code § 67-5902(6), and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*.

## JURISDICTION AND VENUE

6. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1332.

7. This Court has original jurisdiction under 28 USC § 1331 with respect to Plaintiff's claims arising under federal law and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper with this Court pursuant to 28 U.S.C. § 1391(b)(1) & (c)(2), and pursuant to 42 U.S.C. § 2000-e(5)(f)(3). Defendant's principal place of business in the United States is its New York Headquarters within the Southern District of New York. Upon information and belief, the employment records relevant are maintained at Defendant's U.S. Headquarters and/or outside of the U.S.

9. The amount in controversy exceeds the sum or value of the jurisdictional requirement of $75,000.

## ADMINISTRATIVE PROCEDURES

10. Ms. Hanson timely filed a Charge of Discrimination with the Idaho Human Rights Commission ("IHRC") and the Equal Employment Opportunity Commission ("EEOC"), charging Defendant with violations of Title VII of the Civil Rights Act and the Idaho Human Rights Act.

11. Plaintiff received her Notice of Right to Sue from the IHRC on July 21, 2025, and from the EEOC on August 12, 2025. She has initiated this action within 90 days of receiving both Notices.

12. As such, Plaintiff has complied with the statutory conditions precedent for instituting this Title VII and IHRA action against Corsearch.

## STATEMENT OF FACTS

13. Ms. Hanson began working for Corsearch in June, 2022, as a Customer Success Manager.

14. In August, 2022, Ms. Hanson was promoted to Global Director of Customer Success for Sports Media and Entertainment. On February 1, 2023, Ms. Hanson was promoted to the role of Director of Customer Success, North America, and on January 1, 2024, Ms. Hanson was promoted to Global Director of Customer Experience.

15. At all times relevant to this Complaint, Ms. Hanson worked remotely out of her home office in Idaho and otherwise traveled for work as needed.

16. Ms. Hanson was very successful in her career at Corsearch. She was promoted three times in less than 18 months. She was well-connected and respected within her field and at the company. Indeed, she had excellent performance evaluations. Her last evaluation was one of the highest across the entire company.

17. In October of 2023, Corsearch launched and communicated a Code of Conduct by which all employees were expected to abide. The Code mandated that employees treat everyone with respect. Corsearch "committed to providing a safe environment for everyone, with a zero-tolerance approach to any discrimination or harassment," and it promised to "deal with concerns immediately."

### The Sexual Assault

18. In late February, 2024, Corsearch sent Ms. Hanson to Amsterdam, Netherlands, for an off-site meeting/workshop.

COMPLAINT AND DEMAND FOR JURY TRIAL - 3

19. During that trip, on the evening of February 27, 2024, Ms. Hanson attended a company-sponsored event with Corsearch employees and executives, including Chief Revenue Officer Jamie Mellalieu.

20. Mellalieu was not only a superior to Ms. Hanson by many levels of management, but he was essentially second-in-command at Corsearch.

21. After an organized boat ride and dinner, Mellalieu and other Corsearch employees (Mellalieu's subordinates) continued to socialize together at bars/clubs. This group included Ms. Hanson, her direct supervisor (Annie Wood, Vice President of Customer Experience), her senior Manager (Matt Serlin, Sr. Vice President Global Client Management), and several other employees.

22. Upon information and belief, the costs associated with the continued socializing were expensed to the company.

23. While out together, Mellalieu grabbed Ms. Hanson's buttocks. She told Mellalieu she was not interested in sexual contact with him.

24. By the end of the evening, Ms. Hanson and others had become intoxicated. At approximately 2:30 am, she took an uber back to the hotel with her supervisors Annie Wood and Matt Serlin, while Mellalieu and other Corsearch employees remained out at a bar/club.

25. At approximately 3:00 am on February 28th, shortly after Ms. Hanson returned to her hotel room, Mellalieu knocked on Ms. Hanson's door. When Ms. Hanson opened the door, he pushed his way in.

26. Once in her room, Mellalieu aggressively sexually assaulted Ms. Hanson on multiple occasions.

27. Ms. Hanson told Mellalieu "no" and to "stop" on multiple occasions, and she tried to redirect his behavior. In response, Mellalieu told her to "just relax."

28. Before and during the assaults, Mellalieu told Ms. Hanson that he was going to become the next CEO and that he needed to know that Ms. Hanson could "be quiet."

29. Ms. Hanson repeatedly told Mellalieu to leave, and Mellalieu finally relented. However, when he neared the door, he suddenly turned around and again physically forced unwanted sexual contact on Ms. Hanson.

30. Ms. Hanson feared the assault would not end and would escalate further. She reached for the door handle and tried to open the door. After jiggling the door handle a few times, an alarm sounded. Mellalieu became startled and finally left the room. Ms. Hanson quickly closed and locked her hotel door.

31. On the evening of February 28, Ms. Hanson confided in her direct supervisor, Wood, about what had happened.

32. The following day, Ms. Hanson also shared what had happened (in more general terms) with her senior manager, Serlin.

33. Wood and Serlin helped Ms. Hanson change her flight to return home early, which she did the following day on March 1, 2024.

34. Wood and Serlin also told Ms. Hanson that they would have to report the assaults to Human Resources, unless Ms. Hanson did so herself. Ms. Hanson conveyed that she was fearful of retaliation and the impact that the assaults would have on her career.

### Corsearch's "Investigation"

35. On or about March 1st, both Wood and Serlin reported the sexual assaults to Angela Williams, Corsearch's Chief People Officer.

36. Williams interviewed Ms. Hanson about the assault on March 4, 2024. Ms. Hanson relayed what had occurred to the best of her recollection.

37. During the interview, Ms. Hanson told Williams that she had spoken to another female employee who had been harassed by Mellalieu. Ms. Hanson provided Williams with this female employee's name, and reported that:

    a. Mellalieu had tried to get into this female employee's hotel room; and

    b. During an upcoming work event in Los Angeles, Mellalieu proposed staying at a separate hotel (away from other Corsearch employees) with this female employee.

38. Williams indicated that she was concerned about Mellalieu's "pattern of behavior," and told Ms. Hanson that she was taking the situation "incredibly seriously."

39. However, during the same interview, Williams:

    a. Asked Ms. Hanson if she and Mellalieu were "drunk" the night of the assault;

    b. Told Ms. Hanson that she needed to make sure she didn't "put [herself] in this position again"; and

    c. Confirmed with Ms. Hanson that Ms. Hanson had not reported the assault to law enforcement.

40. At the conclusion of this meeting, Williams assured Ms. Hanson she would take action and that "this needs to be stopped." Williams told Ms. Hanson that Mellalieu should not have any contact with her and to report it if he did.

41. Upon information and belief, the company hired an outside investigative consultant, Luke Watkeys, to assist Williams with the investigation. While Watkeys spoke with

Mellalieu directly, he never spoke with Ms. Hanson about what occurred. Indeed, the company did not tell Ms. Hanson it was hiring an outside investigator until it disclosed the conclusion of its investigation to her.

42. During the investigation, Ms. Hanson supplied Corsearch with: photos of bruising that resulted from the assault; data from her watch that showed an increased heart rate at the time of the assault; and verification from multiple witnesses regarding Ms. Hanson's emotional state after the assault.

43. During the investigation, Mellalieu also admitted that he went to Ms. Hanson's hotel room drunk at 3:00 a.m.

44. During the investigation, Williams informed Ms. Hanson that Mellalieu had hired his own attorney to represent him during the investigation.

45. After the fact, the company claimed that it "suspended" Mellalieu during the investigation. However, if that is true, that information was not shared with Ms. Hanson until the end of the investigation, and as set forth below, Ms. Hanson had reason to believe that Mellalieu was at work throughout March, 2024.

46. Indeed, during the week of March 11, 2024, Ms. Hanson saw that Mellalieu was active on Teams, signaling that he was still working. Similarly, on March 26, 2024, Ms. Hanson learned Mellaleiu was "back at work," even though she had received no warning from HR.

47. These encounters with Mellalieu caused Ms. Hanson significant anxiety and emotional distress. Since the sexual assault, Ms. Hanson had been experiencing panic attacks, heightened anxiety, depression, random crying, hyper alertness, being easily scared and belabored breathing. Ms. Hanson sought medical treatment for these symptoms, and she was eventually diagnosed with Post-Traumatic Stress Disorder ("PTSD") on May 22, 2024.

48. Any encounters, even virtual, with Mellalieu triggered and exacerbated Ms. Hanson's PTSD symptoms.

49. On March 27, 2024, Ms. Williams met with Ms. Hanson to relay the results of the investigation. According to the company, the investigation found that both Ms. Hanson and Mellalieu were credible and consistent in their version of events. The company said that Williams and Watkeys concluded that the investigation had been exhausted and that Hanson's allegations had not been fully substantiated.

50. Williams told Ms. Hanson that Mellalieu had admitted coming to her room at 3 a.m. while he was drunk, and he also admitted that he had told her that he wanted to take over the company. However, according to Williams, Mellalieu denied that he had been violent or aggressive or that any sexual contact had occurred. Instead, Mellalieu reportedly told the company that he went to Ms. Hanson's room because she had been flirtatious with him and he wanted to clarify (drunk, at 3 a.m.) that things between them needed to stay professional and on a "friends-only" basis.

51. After Williams met with Ms. Hanson, Corsearch sent Ms. Hanson a letter on March 27, 2024. The letter stated that "there [was] not enough evidence for the investigation to make a definitive finding one way or the other regarding what happened in the hotel room." The standard applied to the investigation was that the company had to "conclusively" or "definitively" determine the actions of the parties in the hotel room.

52. When Williams presented Ms. Hanson with the letter, Williams told Ms. Hanson that because other witnesses confirmed Mellalieu had a history of intoxication at work events, the company had restricted Mellalieu from drinking during or after company events or with company colleagues or clients.

53.     At this same time, Williams told Ms. Hanson that although Corsearch would try to limit contact between Ms. Hanson and Mellalieu, it had no specific plan on how to do so. Indeed, Williams placed the onus on Ms. Hanson to suggest accommodation(s) to address her safety concerns in the workplace without jeopardizing her career. Corsearch said it would "try and accommodate" her requests and directed her to work with her supervisors.

## Ms. Hanson's Constructive Discharge

54.     Thereafter, Ms. Hanson's work opportunities immediately started to significantly decrease.

55.     For example, in early April, Ms. Hanson found out she had not been invited to an important Customary Advisory Board ("CAB") meeting. CAB meetings are generally held only a few times a year, and they are attended by Corsearch's key clients who collaborate and provide feedback to the company to facilitate further improvements to Corsearch's services.

56.     In her Customer Success and Customer Experience roles, Ms. Hanson had been responsible for planning and attending the quarterly or biannual CAB meetings. However, on April 2, 2024, Ms. Hanson learned that she had not been invited to the next CAB meeting, and another employee was going in her stead.

57.     On April 4th, Ms. Hanson's supervisor informed her that she could no longer attend a work event in London scheduled later in the month. Ms. Hanson suspected it was because Mellalieu would be attending a leadership meeting at the same time in London.

58.     Also in early April, 2024, Ms. Hanson logged onto the company's virtual town hall meeting to find that Mellalieu was not only attending the meeting but was leading it. This triggered a full-blown panic attack, causing Ms. Hanson to hyperventilate, have heart palpitations, tightness in her chest, and cry uncontrollably. She was unable to be productive/work.

59. On April 8th, during a Coresearch "female voices listening session," a female leader said she was concerned for the safety of women in the industry and did not want to let a female member of her team go to conferences alone anymore. This was another trigger for Ms. Hanson and affirmed her fears about her own and other women's safety in the workplace.

60. On April 10th, Ms. Hanson learned that one of Mellalieu's key team members would be present at a roundtable launch call. This caused Ms. Hanson to have another panic attack, and she was forced to miss the call.

61. On April 19th, Ms. Hanson was included on an email to a small group of individuals regarding working on responses for a customer. The email included Mellalieu, which again triggered a panic attack.

62. All of these encounters triggered Ms. Hanson's PTSD and caused her to have significant panic attacks, and other symptoms such as: flashbacks, hyperventilating, racing heart, tightness in her chest, chills with sweat, lower back pain/tightness, cramping in her abdomen, depression and withdrawal/isolation. Ms. Hanson's PTSD became so significant that she had trouble going into her home office, and it significantly affected her performance at work. Ms. Hanson felt stuck between having to disclose to customers and colleagues that she had been sexually assaulted by an executive in order to explain her out-of-character behavior and performance or make up untrue excuses.

63. Additionally, during this same time frame, Ms. Hanson learned the following from colleagues:

    a. Ms. Hanson was told that there were reports from two other female employees about Mellalieu's misconduct prior to his assault of her (and as indicated above,

one incident also included Mellalieu trying to force his way into a female subordinate's hotel room while drunk on a company trip);

   b. Ms. Hanson learned that in early March, 2024, an HR official told a female colleague that discriminatory behavior (being talked over and dismissed by male leaders in a particular incident) happens "across the board," and she doubted that "anything [would] ever change";

   c. In explaining to a female colleague why Ms. Hanson had missed a meeting, the colleague agreed that the company did not support women and shared her own experience of gender discrimination at Corsearch; and

   d. It was reported to Ms. Hanson that Mellalieu was seen drinking at at least one company event, indicating to her that the company would not, or could not, hold him accountable as it said it would.

  64. With ongoing triggers in the workplace, Ms. Hanson's physical and mental health continued to decline. She had difficulty every day focusing and functioning, which affected her normal level of excellent performance. This in turn further exacerbated her anxiety and distress.

  65. Ms. Hanson's mental and physical health continued to deteriorate until her healthcare providers recommended that she take FMLA leave.

  66. Ms. Hanson requested medical leave on April 23, 2024, and Corsearch approved her medical leave from April 23, 2024 through June 21, 2024.

  67. As her leave was ending, Ms. Hanson and her providers determined that she could not feasibly return to work with Mellalieu still employed at Corsearch. As demonstrated by the prior three months, interactions with Mellalieu were ongoing and unavoidable in her position, and

Ms. Hanson was unable to be a productive employee while also maintaining her physical and mental well-being.

68. Factors in this assessment included the following:

    a. The company had not adequately reprimanded and/or enforced its reprimand of Mellalieu;

    b. Other females expressed concerns about widespread harassment and discrimination against women, including concerns about the safety of women at company/industry events;

    c. Corsearch had failed to create or enforce measures to ensure that Ms. Hanson would not have to interact with Mellalieu;

    d. Interaction and/or oversight, directly or indirectly, with/by Mellalieu was unavoidable given Ms. Hanson's job description;

    e. Mellalieu was and would remain a decisionmaker regarding many aspects of Ms. Hanson's job and of her upward trajectory;

    f. Corsearch had excluded Ms. Hanson from company events because of possible interaction with Mellalieu; and

    g. Corsearch had made it clear that it would not enforce its supposed zero-tolerance code of conduct.

69. Ms. Hanson and her providers concluded that there was no way for Ms. Hanson to return to work and avoid the triggers associated with her PTSD and anxiety. This in turn meant she could not adequately perform her duties or feel safe at work. Ms. Hanson had no choice but to submit her resignation on June 17, 2024.

## CLAIM FOR RELIEF
**(Sexual Harassment, Hostile Work Environment and Constructive Discharge**

**in Violation of Title VII of the Civil Rights Act and the Idaho Human Rights Act)**

70. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

71. Plaintiff has been subjected to a hostile and offensive work environment in violation of the Idaho Human Rights Act and Title VII of the Civil Rights Act of 1964, which includes but is not limited to: Mellalieu's unwanted and unwelcomed sexual harassment and sexual assault of Ms. Hanson on February 27-28, 2024; and the general atmosphere of hostility and discrimination against women at Corsearch, which includes but is not limited to the following:

    a. Other Corsearch female managers expressed concerns about widespread harassment and discrimination within the company, and they refused to send female subordinates to company or industry events for fear of their safety;

    b. Female Corsearch employees were talked over and dismissed by male managers, and Corsearch HR believed it was a broad problem that would never change;

    c. Corsearch failed to enforce its zero tolerance policy;

    d. HR failed to take prompt and appropriate remedial action to curb or stop harassing or discriminatory behaviors in the workplace;

    e. Corsearch did nothing to limit Ms. Hanson's interactions with Mellalieu, but instead expected her to offer or find ways to avoid contact with Mellalieu without sacrificing her performance or advancement;

    f. Corsearch chose not to invite (or uninvite) Ms. Hanson to specific events after she reported the assault; and

    g. Women held very few upper management positions at Corsearch, and/or were quickly replaced by or passed over in favor of men.

72. The above conduct was severe and/or pervasive and altered the conditions of Plaintiff's employment.

73. Corsearch is liable for Mellalieu's harassing conduct, including his assault of Plaintiff, because as Chief Revenue Officer, Mellalieu was the alter ego and/or proxy of Corsearch.

74. Likewise, Corsearch is vicariously liable for Mellalieu's harassment and the hostile environment perpetrated by other supervisors.

75. Finally, Corsearch is liable for Mellalieu's harassing conduct and the broader hostile environment because it knew or should have known about the harassing/discriminatory misconduct, and it failed to take prompt and adequate remedial measures to prevent ongoing harassment in the workplace.

76. Corsearch's actions created a hostile work environment in which Ms. Hanson could not perform her job adequately and where she feared for her safety. Indeed, the sexual assault, the company's response thereto, and the later triggering events resulted in severe emotional distress to Ms. Hanson and interfered with her ability to return to her normal range of work performance.

77. Corsearch's actions and inactions ultimately lead to Ms. Hanson's constructive discharge on June 17, 2024.

78. As a consequence of Corsearch's actions, Ms. Hanson suffered and will continue to suffer losses. Ms. Hanson is entitled to compensatory damages, back and front pay, and attorney costs.

79. Additionally, Corsearch's actions were in reckless disregard for Ms. Hanson's protected rights, and as such, it is also liable for punitive damages.

**JURY DEMAND**

80. Plaintiff demands a trial by jury on all issues of fact and damages stated herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following relief.

a. Back pay, in amounts to be determined at trial;

b. Compensatory and consequential damages;

c. Front pay in lieu of reinstatement;

d. Injunctive and/or declaratory relief;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

f. Attorneys' fees and costs of this action, including expert witness fees, as appropriate;

g. Payment to offset any tax gross up from an award of back and/or front pay;

h. Punitive damages;

g. Any such further relief as justice allows.

Dated this 15th day of October, 2025.

_____
Rebecca Houlding (NY Bar No. RH8107)
HOULDING LAW PC
431 Classon Ave, Suite 1B
Brooklyn, NY 11238
Telephone: (646) 561-9119
Email: rebecca@houldinglaw.com

Erika Birch (Idaho Bar No. 7831, to be admitted *pro hac vice*)
Kass Harstad (Bar No. 8419, to be admitted *pro hac vice*)
BIRCH HALLAM HARSTAD & JOHNSON, LLC
1516 W. Hays St.
Boise, Idaho 83702
Telephone: (208) 336-1788
Email: erika@idahojobjustice.com
          kass@idahojobjustice.com

Attorneys for Plaintiff